IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
September 21, 2004 Session

## STATE OF TENNESSEE v.
## RONALD EUGENE HALL and HENRY LEE DIXON

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2001-D-1974     Walter Kurtz, Judge**

**No. M2003-02326-CCA-R3-CD - Filed February 8, 2005**

Defendants Ronald Eugene Hall and Henry Lee Dixon were each indicted on one count of first degree felony murder, one count of first degree premeditated murder and one count of attempted especially aggravated robbery. Following a jury trial, Defendant Hall was convicted of the lesser included offense of second degree murder on counts one and two and was found not guilty on count three, attempted especially aggravated robbery. The trial court merged Defendant Hall's conviction of second degree murder in count two with his second degree murder conviction in count one and sentenced him to twenty years. Defendant Dixon was found not guilty in counts two and three and convicted in count one of the lesser included offense of facilitation of second degree murder. The trial court sentenced Defendant Dixon to nine years in the Tennessee Department of Correction. Defendant Hall argues on appeal that (1) the trial court erred in its instruction to the jury on the definition of reasonable doubt; (2) the trial court erred in providing the jury with an instruction on the introduction of fingerprint evidence; (3) the trial court erred in admitting certain photographs during Officer George Bouton's testimony; and (4) the trial court erred in failing to instruct the jury as to facilitation as a lesser included offense of the indicted offenses. Defendant Dixon challenges the sufficiency of the convicting evidence and argues that the trial court erred in not admitting a video animation portraying the sequence of events described during Defendant Dixon's testimony. Defendant Dixon also argues that his sentence is excessive. Defendant Hall did not appeal the length of his sentence. After a thorough review of the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which DAVID G. HAYES and JERRY L. SMITH, JJ., joined.

Paul J. Bruno, Nashville, Tennessee, for the appellant, Ronald Eugene Hall; Cynthia M. Fort, Nashville, Tennessee (on appeal); and Glenn Funk, Nashville, Tennessee (at trial), for the appellant, Henry Lee Dixon.

Paul G. Summers, Attorney General and Reporter; Elizabeth T. Ryan, Assistant Attorney General; Victor S. (Torry) Johnson III, District Attorney General; and Bret Gunn, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

### I. Background

Marcus Scott was the victim of a homicide in this case. Samuel Scott, Jr., said that he knew his son, Marcus Scott, was dating Linda Provost. However, Samuel Scott, Jr. had not met the young woman. Mr. Scott said his son left their apartment after he received a telephone call around 10:18 p.m. on July 20, 2001. Approximately five minutes later, Mr. Scott heard four successive shots. Mr. Scott said that his son did not own a gun.

Shaquita Brooks said that she had seen Marcus Scott a couple of times with Ms. Provost and knew the couple was dating. Ms. Provost told her that Mr. Scott had hit her during one of their dates. Ms. Brooks was aware that Defendant Hall had previously dated Ms. Provost, but she had never met him.

Ms. Brooks said that Ms. Provost picked her up around 8:30 p.m. on July 20, and the two women drove to Percy Priest Lake to see one of Ms. Provost's friends. While the women were at the lake, Defendant Hall called Ms. Provost and asked if he could see her. Ms. Provost and Ms. Brooks then drove to the Kroger parking lot on Gallatin Road to meet Defendant Hall.

After they arrived at the parking lot, Ms. Provost got out of the car and hugged Defendant Hall. Ms. Provost and Defendant Hall then began discussing how to lure Mr. Scott out of his apartment. Both agreed that Ms. Provost would call Mr. Scott and ask him to meet her at her car. Ms. Provost wanted Defendant Hall to accost Mr. Scott before he got into her car. Defendant Hall wanted to wait until Mr. Scott was inside the car and then drag him back out of the car onto the sidewalk. Ms. Brooks said that she did not know what Defendant Hall intended to do after he confronted Mr. Scott.

Defendant Hall used Ms. Provost's cell phone, and Ms. Brooks heard Defendant Hall say that Ms. Provost did not want to go through with "their" plan. Defendant Dixon then walked up and joined Ms. Provost's and Defendant Hall's discussion about the best way to confront the victim. Ms. Provost told the men to get in her car so she could show them the bushes behind Kroger where they could hide before grabbing Mr. Scott. Ms. Brooks said that Mr. Scott's apartment building was across the street from the bushy area. Defendant Hall and Defendant Dixon got out of Ms. Provost's car in front of Mr. Scott's apartment building and said they would call Ms. Provost in ten minutes.

After a few minutes, Defendant Hall and Defendant Dixon walked back to the parking lot. Defendant Dixon told Ms. Provost that her plan would not work because there were too many people

about. Defendant Dixon said he and Defendant Hall would pretend to steal Ms. Provost's purse. Defendant Dixon told Ms. Provost that there were not any bullets in "the gun." Defendant Hall asked Ms. Provost if Mr. Scott had any money, and Ms. Provost said that the victim always carried cash with him. In order to scare Ms. Provost into abandoning the plan, Ms. Brooks warned the group that the victim might be armed. Ms. Brooks said that either Defendant Hall or Defendant Dixon replied that the victim would not have time to use a gun because they "would be on him." Ms. Brooks said that Defendant Dixon was the first one to mention that he and Defendant Hall had a gun. On cross-examination, Ms. Brooks said that Defendant Dixon was not armed.

Ms. Brooks argued with Ms. Provost and got in Defendant Dixon's car. She and the two men drove to the victim's apartment building. The men got out, and Ms. Brooks drove Defendant Dixon's car back to the Kroger parking lot. Shortly thereafter, Mr. Dixon came running up to the car, nervous and upset. Ms. Brooks then heard about three gunshots. Mr. Dixon told her that he thought "he shot him." A few seconds later, Defendant Hall got in the car, and said that "he didn't have any money on him." The trio left the parking lot. Defendant Dixon let Ms. Brooks out at the H.G. Hill's store across the street, and the two men drove away. Ms. Brooks tried to telephone Ms. Provost once, but did not reach her.

Ms. Brooks was later recalled as a witness by the defense and admitted that she had not told the police that Defendant Hall said anything when he returned to the car after the shooting.

Cynthia Human lived behind Kroger. On the evening of July 20, she heard three or four gunshots. Ms. Human looked out the window and saw the rear end of an automobile in the Kroger parking lot. The car drove away two or three minutes after the gunshots. Ms. Human did not see anyone either outside or inside the car.

Officer Gary Poteet arrived at the scene at 10:30 p.m. Ms. Provost was lying in the street, wounded. Marcus Scott, who had also been shot, was in the front passenger seat of a green vehicle. The seat was in a reclined position. Officer Poteet said that Ms. Provost told him that she did not know who shot her because the shooter wore a ski mask.

Officer Johnny Lawrence retrieved two projectiles from the seat in which Mr. Scott had been sitting and two projectile fragments from the driver's seat. Officer Lawrence did not find any shell casings at the scene. Officer Daniel Orr examined the vehicle at the police station and found a shell casing in the rear floor board behind the passenger seat. Officer Lorita Marsh matched both Defendants' fingerprints with fingerprints found on the car's frame and on items in the car.

Officer George Bouton photographed the scene. He inserted wooden rods through the holes made by the bullets in the passenger seat's upholstery to illustrate the bullets' path and then photographed the rods.

Dr. Thomas Deering, an assistant medical examiner for Davidson County, performed Mr. Scott's autopsy. Dr. Deering said that either three or four bullets entered Mr. Scott's body. The path

of two of the bullets struck major organs and were fatal injuries. On cross-examination, Dr. Deering said that Mr. Scott also had a small laceration over his left eye that was consistent with being struck with a fist.

Linda Provost testified that she met Mr. Scott in McMinnville, Tennessee about a month before the incident. Around July 16, 2001, she accompanied Mr. Scott to his motel room because he told her there was going to be a party. No one else was in the room, and Ms. Provost attempted to leave. During a struggle, Mr. Scott struck Ms. Provost in the face with his fist.

Ms. Provost had dated Defendant Hall when they were in high school. Shortly before the shooting, Defendant Hall began calling Ms. Provost again in an attempt to resume their relationship. Defendant Hall called Ms. Provost on the night of her altercation with Mr. Scott, and Ms. Provost told Defendant Hall about the incident because she was upset. Ms. Provost said Defendant Hall said that he would "take care of it."

Ms. Provost said that she arranged to meet Defendant Hall at the Kroger parking lot on July 20. When she arrived, Defendant Hall told her that "he had it planned out." Ms. Provost said that she was supposed to park in front of the victim's apartment building, call the victim on her cell phone, and ask him to come out and see her. Once the victim was in the car, Defendant Hall said he and Defendant Dixon would stage a robbery and drag Mr. Scott out of the car. Ms. Provost said that neither Defendant Dixon nor Defendant Hall told her what they planned to do when they got the victim out of the car, but she assumed they were going to beat up Mr. Scott. Ms. Provost said that there was never any mention of shooting or robbing the victim, other than a staged robbery. Ms. Provost said that she met Defendant Dixon for the first time that night.

Ms. Provost said that she drove to the victim's apartment building as planned, and Mr. Scott came out to her car. He got in the passenger seat, and Ms. Provost heard a noise outside the open passenger side window. Ms. Provost said she was shot and then heard two more gunshots. Ms. Provost saw Defendant Hall fire the shots. She got out of her car and saw Defendant Hall run toward the Kroger parking lot. Ms. Provost called 911 with her cell phone.

On cross-examination, Ms. Provost said that Defendant Dixon was not with Defendant Hall when the shooting occurred. She admitted she lied to the police when she told them the shooter wore a ski mask.

The State introduced the phone logs Ms. Provost's cell phone reflecting the telephone calls that were made on the night of the shooting. At 9:32 p.m., Ms. Provost's cell phone was used to place a call to Mr. Scott. A second phone call to the victim was made at 10:18 p.m. A 911 call was made from Ms. Provost's cell phone at 10:24 p.m.

Defendant Dixon testified that Defendant Hall came by his apartment around 8:14 p.m. on July 20. Defendant Hall asked him to go with him and meet Ms. Provost and her friend. Defendant Dixon said that his date for the evening was delayed so he agreed to accompany Defendant Hall.

When they arrived at the Kroger parking lot, Defendant Dixon let Defendant Hall out of the car and found a parking place. He said that he and Ms. Brooks chatted, and he did not hear what Defendant Hall and Ms. Provost were talking about. Defendant Hall called him on his cell phone and told him about the altercation between Ms. Provost and the victim. Defendant Hall asked him to come over to Ms. Provost's car so they could discuss a plan of action. Defendant Dixon said that neither he nor Ms. Brooks wanted to get involved, and Defendant Dixon kept trying to leave. Defendant Hall told him to wait until he calmed down Ms. Provost. Defendant Dixon said that he walked over to the bushes at the back of the Kroger parking lot in order to relieve himself.

Ms. Provost drove out of the parking lot, and Defendant Hall told Defendant Dixon he was going with her. Defendant Dixon said he walked back to his car and was starting to leave when he heard gunshots. Defendant Dixon pulled his car out of the parking lot and saw Defendant Hall. Defendant Hall jumped into his car, and Defendant Dixon said he let both Defendant Hall and Ms. Brooks out at the H.G. Hill's across the street. Defendant Dixon said that he drove away at that point. Defendant Dixon denied that he helped plan either an assault or a robbery on the victim.

On cross-examination, Defendant Dixon admitted that his testimony in court was different from his two prior statements made to the police. Defendant Dixon said that he occasionally advised Defendant Hall who was eighteen or nineteen at the time of the incident, and had helped Defendant Hall find a job. Defendant Dixon admitted that Defendant Hall had asked him what to do about Ms. Provost getting hit by Mr. Scott on a couple of occasions prior to the shooting. Defendant Dixon said that he knew Defendant Hall and Ms. Provost wanted to do something to the victim, but he denied that either one of them had mentioned robbing or shooting the victim.

## II. Jury Instructions

A. "Reasonable Doubt"

The trial court instructed the jury, in part, that "Reasonable doubt does not mean a doubt arising from possibility." Defendant Hall argues that the trial court erred in not inserting the word "mere" in front of the word "possibility." Although he does not cite any authority in support of his position, Defendant Hall contends that reasonable doubt is, in fact, always based on a possibility that some other explanation for a defendant's conduct exists. We find Defendant Hall's issue to be without merit. *See* Tenn. Ct. Crim. App. R. 10(b).

The trial court utilized Tennessee Pattern Jury Instruction–Criminal (T.P.I) 2.03 (2003) which provides that:

> [a] reasonable doubt is a doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily as to the certainty of guilt. Reasonable doubt does not mean a doubt that may arise from possibility. Absolute certainty of guilt is not demanded by the law to convict of any

criminal charge, but moral certainty is required, and this certainty is required as to every proposition of proof requisite to constitute the offense.

"The beyond a reasonable doubt standard is a requirement of due process, but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course." *Victor v. Nebraska*, 511 U.S. 1, 5, 114 S. Ct. 1239, 1243, 127 L. Ed. 2d 583 (1994). Furthermore, "so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, . . . the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof." *Id.* (citations omitted). Considering the full context of the instruction, we conclude that the trial court's instruction on the definition of reasonable doubt "sufficiently described the degree of doubt necessary for acquittal and the degree of proof necessary for conviction." *Pettyjohn v. State*, 885 S.W.2d 364, 365 (Tenn. Crim. App. 1994). Defendant is not entitled to relief on this issue.

B.  Fingerprint Evidence

Defendant Hall argues that the trial court erred in providing the jury with an instruction on fingerprint evidence based on Officer Marsh's testimony. *See* T.P.I.–Crim. 42.17(2003). Defendant does not challenge the content of the instruction but contends that the jury instruction gave "undue emphasis" to the fingerprint evidence in light of the evidence's lack of significance. As the State points out, Defendant Hall cites no authority to support his argument and has therefore waived the issue. Tennessee Court of Criminal Appeals Rule 10(b) states that "[i]ssues which are not support by argument, citation to authorities or appropriate references to the record will be treated as waived by this court." Tenn. Ct. Crim. App. R. 10(b). Defendant Hall is not entitled to relief on this issue.

C.  Lesser Included Offenses

Defendant Hall argues that the trial court erred in not instructing the jury on the lesser included offenses of facilitation of first degree felony murder and facilitation of first-degree premeditated murder. Defendant contends that the evidence could support a finding by the jury that Ms. Provost spearheaded the plans to confront Mr. Scott, and that Defendant Hall's conduct facilitated Ms. Provost in the commission of the offenses against Mr. Scott.

At the hearing on the trial court's proposed instructions to the jury, Defendant Hall's counsel requested the trial court to provide an instruction on facilitation of felony murder.

THE COURT:  Even though, all the proof is that he's the trigger man, so-called triggerman?  I mean, that's kind of a common part of this.

DEFENDANT
HALL'S COUNSEL:  I think under the theory of Linda Provost as the head of the robbery.  In other words, this is her robbery.

THE COURT:                  So even though all the proof that [Defendant Hall] shot, he's just the facilitator?

DEFENDANT
HALL'S COUNSEL:   He could be the facilitator of a robbery. I'm not talking about the first degree premeditated [charge]. I'm just saying under the felony murder, if he was the facilitator of the robbery, in the case, with Linda Provost, that could be the theory from which I rely upon in the case.

A panel of this Court recently addressed the legislative amendments to Tennessee Code Annotated section 40-18-110 which altered the procedural requirements for preserving an issue for appeal that involves a trial court's failure to instruct the jury on a particular lesser included offense. *See State v. Robert Page*, No. W2003-01342-CCA-R3-CD, 2004 Tenn. Crim. App. LEXIS 753 (Tenn. Crim. App., Jackson, Aug. 26, 2004), *perm. to appeal granted* (Jan. 18, 2005). Pursuant to the amended statutory provisions, the trial court's failure to instruct the jury on a particular lesser included offense may not be raised on appeal or in a motion for new trial unless the defendant requests in writing that the trial court provide such an instruction prior to the trial court's charge to the jury. Tenn. Code Ann. § 40-18-110(c). In *Page*, two members of the panel concluded that "the waiver provision of Tennessee Code Annotated section 40-18-110 is an unconstitutional abrogation of a criminal defendant's constitutional right to have the jury charged on all offenses included within the indicted offense and supported by the proof adduced at trial." *Page*, 2004 Tenn. Crim. App. LEXIS 753, at \*41. A dissenting member of that panel, however, expressed the view that a defendant must request an instruction of the lesser included offense *on the record* prior to the trial court's charge to the jury; otherwise, the right to appeal the trial court's failure to so instruct is waived. *See id.*, at \*51, Hayes, J., concurring in part, dissenting in part. A majority of the panel in this case *sub judice* agrees with the dissenting opinion in *Page*.

By law, a trial judge is required to appoint a court reporter in all felony cases whose function it is to provide a verbatim record of all proceedings in open court and such other proceedings as the judge may direct. *See* Tenn. Code Ann. §§ 40-14-301(3); -302; and -307. Once the transcript of the evidence is filed with the clerk of the trial court, the transcript becomes the record of the trial court, and the record of this Court for purposes of appeal. *State v. Watts*, 670 S.W.2d 246, 249 (Tenn. Crim. App. 1984); *see also* Tenn. R. App. P. 24. An appellate court can only consider those issues which are preserved in the record. *State v. Banes*, 874 S.W.2d 73, 82 (Tenn. Crim. App. 1993). Thus, an oral request for an instruction of a lesser included offense which is made on the record in a felony case where by law a court reporter must be present to prepare a verbatim record of the proceedings, satisfies the "in writing" requirement of Tennessee Code Annotated section 40-18-110 so long as the oral request is made prior to the trial court's charge to the jury and regardless of whether the proposed charge is reduced to writing. *See* Tenn. Code Ann. § 40-30-111(b); *State v. Higgins*, 729 S.W.2d 288, 290-91 (Tenn. Crim. App. 1987) (It has long been recognized in the post-conviction arena that a trial court's failure to reduce its findings of fact and conclusions of law to writing as statutorily required may be harmless error if the trial court orally pronounces its findings from the bench).

First, we note that counsel for Defendant Hall specifically agreed that a charge on the lesser included offense of facilitation of first degree premeditated murder was not indicated by the evidence, and thus did not request such a charge. Accordingly, this issue may not be presented as a ground for relief in either a motion for new trial or on appeal. Tenn. Code Ann. § 40-18-110(d). Because, however, Defendant Hall did orally request an instruction on the offense of facilitation of felony murder, we will address the merits of Defendant Hall's issues concerning the trial court's omission of this charge.

Under the test enunciated in *State v. Burns*, 6 S.W.3d 453 (Tenn. 1999), facilitation is a lesser included offense of felony murder. *Id*. at 466-467; *see also State v. Ely*, 48 S.W.3d 710, 720 (Tenn. 2001). "Whether or not a particular lesser included offense should be charged to the jury depends of whether proof in the record would support the lesser charge." *Burns*, 6 S.W.3d at 468. Our supreme court recently reiterated that:

> [t]his Court has adopted a two-step inquiry for determining if the evidence justifies a jury instruction on a lesser-included offense. The trial court must first determine:
>
> > 'whether any evidence exists that reasonable minds could accept as to the lesser-included offense. In making this determination, the trial court must view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence. Second, the trial court must determine if the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser-included offense.'

*State v. Robinson*, 146 S.W.3d 469, 486 (Tenn. 2004) (quoting *Burns*, 6 S.W.3d at 469). "Whether an instruction is required depends upon the evidence, not the theory of the defense or the State." *Id*. (citing *State v. Allen*, 69 S.W.3d 181, 188 (Tenn. 2002); *State v. Richmond*, 90 S.W.3d 648, 660 (Tenn. 2001)).

"A person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403(a). One is criminally responsible for another's offense if "[a]cting with the intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, or aids or attempts to aid another person to commit the offense." *Id*. § 39-11-402(2). Thus, in the case *sub judice*, in order for a reasonable jury to have found Defendant Hall guilty of facilitation of felony murder, "the jury would have to conclude that the defendant, while *lacking* the intent to promote or assist the commission of either offense, knowingly furnished substantial assistance in the commission of premeditated murder and [felony murder]." *Robinson*, 146 S.W.3d at 487. Based upon our review, the record does not support such a conclusion.

-8-

Ms. Provost testified that she told Defendant Hall about her altercation with Mr. Scott, and Defendant Hall told her he "would take care of it." Defendant Dixon conceded that on two occasions Defendant Hall had asked his advice about responding to Mr. Scott's attack on Ms. Provost. When Ms. Provost and Defendant Hall met a few days later at the Kroger parking lot, Defendant Hall told her they should stage a robbery and asked if Mr. Scott had any money. There was no evidence that Ms. Provost planned to rob Mr. Scott. Ms. Provost said she thought that the goal of the confrontation with Mr. Scott was to beat the victim up, not rob or kill him. Ms. Brooks corroborated Ms. Provost's testimony that the staged robbery was Defendant Hall's plan. Ms. Provost stated that the victim had just sat down in her car when Defendant Hall fired his weapon, striking both the victim and Ms. Provost.

In *Ely*, the defendant was present at the scene of the robbery, he knew his co-defendant was going to commit robbery, and the defendant furnished substantial assistance in the commission of the offense. The supreme court concluded that no reasonable jury would have concluded that the defendant acted without any intent 'to promote or assist the commission of the offense or to benefit in the proceeds or results of the offense.'" *Ely*, 48 S.W.3d at 724 (quoting *Burns*, 6 S.W.3d at 470-71). *See also Robinson*, 146 S.W.3d at 148 ("It simply defies logic to conclude that the defendant, while not intending to aid or promote [the victim's] murder, nevertheless ordered other gang members to take [the victim] 'out of the district, rough him up a little bit by physical abuse, and let him get back the best way he could,' knowing all along that these gang members intended to kill [the victim]").

From the evidence presented at trial in the instant case, no reasonable jury could have concluded that Defendant Hall had the knowledge required to facilitate the offense of felony murder but lacked the intent required for criminal responsibility. Accordingly, we conclude that the trial court did not err in failing to provide an instruction to the jury as to the lesser included offense of facilitation of felony murder. Defendant Hall is not entitled to relief on this issue.

### III. Admission of Photographs

Defendant Hall argues that the trial court erred in admitting certain photographs taken by Officer Bouton during his examination of Ms. Provost's car. Officer Bouton stated that he inserted wooden rods into the bullet holes found in the passenger seat to approximate the path of the bullets and then photographed the rods. During a hearing out of the presence of the jury, Officer Bouton said that his examination of the car led him to conclude that the car seat had been in the upright position when the shots were fired based on the awkward angles depicted by the rods. Officer Bouton conceded that he did not have any information about the victim's wounds or the path the bullets took through the victim's body at the time he examined the bullet holes. The trial court found that Officer Bouton's photographs were admissible, but concluded that Officer Bouton could not testify as to the conclusions he drew from his observations.

Although Defendant Hall cites no authority in support of his position, he argues that Officer Bouton's "experiment" was nothing more than a rudimentary attempt at a ballistics test by a non-

expert.  We agree with the State's assessment that Defendant Hall's argument is essentially one of relevancy.  The admissibility of photograph evidence rests within the sound discretion of the trial court and will not be disturbed on appeal absent a clear showing of an abuse of discretion.  *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978).  Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Tenn. R. Evid. 401.  However, "relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury."  Rule 403.

The State argues that the photographs were relevant to support its theory that the victim was first shot, and then the passenger seat was lowered into a reclined position so that Defendant Hall could rob the victim.  The jury, however, obviously rejected the State's theory when it found Defendant Hall not guilty of attempted especially aggravated robbery.  Even if it were error for the trial court to admit the photographs, we cannot conclude that the evidence more probably than not affected the result of the trial.  *See* Tenn. R. App. P. 36(a); Tenn. R. Crim. P. 52(a).  Any error in the admission of this evidence was therefore harmless.

## IV.  Sufficiency of the Evidence

Defendant Dixon argues that the evidence was insufficient to support his conviction for facilitation of second degree murder.  We must first address whether the issue has been waived by the untimely filing of Defendant Dixon's notice of appeal.  The trial court denied Defendant's motion for new trial on August 21, 2003.  Defendant Dixon filed his notice of appeal on September 26, 2003.  A notice of appeal is required to be filed with the clerk of the trial court within thirty days after the date of entry of the judgment from which relief is sought.  Tenn. R. App. P. 4(a).  The timely filing of a notice of appeal is not, however, a prerequisite to the jurisdiction of this Court. This Court may waive the requirement in the interest of justice.  *Id.*  We conclude that waiving the timely filing requirement in the instant case serves the interest of justice and decide to consider all of the issues in Defendant Dixon's appeal.

Defendant Dixon argues that no evidence was presented at trial that he knew Defendant Hall was going to commit second degree murder.  Defendant Dixon contends that the evidence showed that the only offenses contemplated by the parties against the victim involved either assault or robbery.  We respectfully disagree with Defendant Dixon's assessment of the evidence.

When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S.307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979).  The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence.  *Id.*

-10-

Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield,* 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

In order to support a conviction for facilitation, the State must prove that the accused knew another intended to commit a specific felony, and that the accused knowingly furnished assistance to the other person in the commission of that offense. *See* Tenn. Code Ann. § 39-11-403; *Ely*, 48 S.W.3d at 719-20.

Defendant Dixon testified that Defendant Hall asked Defendant Dixon on two occasions prior to the shooting what he should do about the victim hitting Ms. Provost. Defendant Dixon drove Defendant Hall to meet with Ms. Provost. Defendant Dixon joined in the discussions between Defendant Hall and Ms. Provost concerning their plan to lure the victim out of his apartment and agreed with Defendant Hall's plan to stage a robbery. After driving around the victim's apartment building, Defendant Dixon told Ms. Provost that there were too many people around to successfully implement her plan. Ms. Brooks testified that Defendant Dixon told Ms. Provost that they were going to take her purse but told her that the gun was not loaded. Defendants Dixon and Hall walked together toward the victim's apartment building while Ms. Brooks drove Defendant Dixon's car back to the Kroger parking lot. Ms. Brooks said that Defendant Dixon ran back to his car before she heard the gunshots. Defendant Dixon told Ms. Brooks that he thought Defendant Hall shot the victim.

Viewing the evidence in a light most favorable to the state, a reasonable jury could have concluded that Defendant Dixon committed the offense of facilitation of second degree murder. Based on Defendant Dixon's participation in the planning stage of the offense, his transportation of Defendant Hall to and from the scene, his knowledge that a firearm would be involved, and his initial presence at the apartment building prior to the shooting, a jury could conclude that Defendant Dixon knew that Defendant Hall intended to knowingly shoot the victim, and that Defendant Dixon knowingly furnished substantial assistance during the planning stage of the offense and up to the point of actual confrontation with Mr. Scott. Because Defendant Dixon left the scene before Defendant Hall shot the victim, a reasonable jury could also include that Defendant Dixon did not intend to promote, assist or benefit from the offense. The evidence is sufficient to support Defendant Dixon's conviction of facilitation of second degree murder.

We are mindful that Defendant Dixon's testimony concerning the sequence of events leading up to the shooting conflicted in large part with the testimony of Ms. Provost and Ms. Brooks. Resolution of these inconsistencies and an assessment of the witnesses' credibility, however, is left to the jury, not this Court. *Bland,* 958 S.W.2d at 659. Defendant is not entitled to relief on this issue.

## V. Admissibility of Computer Animation

Defendant Dixon argues that the trial court erred in not admitting a computer animation that portrayed his version of the sequence of events immediately prior to the shooting. The trial court held a hearing outside the presence of the jury concerning the admissibility of the evidence. Defendant Dixon narrated the animation as it played. The first frames showed an aerial view of the Kroger parking lot with Defendant Dixon's car. The next frames, from both an aerial and a lateral viewpoint, showed figures representing Defendants Dixon and Hall conversing beside Defendant Dixon's car. The two figures then walk toward the back of the parking lot facing 12th Street where Defendant Dixon said that he relieved himself in some bushes. Ms. Provost's car appears on 12th street. Defendant Dixon turns and walks back toward his car while Defendant Hall walks over to Ms. Provost's car which has stopped at the curb. In the next frame, Defendant Dixon begins to enter his car as the word "bang" floats across the screen. Defendant Dixon closes his car door, and the word "bang" appears on the screen again.

On cross-examination, Defendant Dixon said that he did not speak directly with the person who made the animation. Instead, he provided information to his counsel who then relayed that information to the producer of the animation. Defendant Dixon conceded that the animation contained a variety of inaccuracies. Defendant Dixon, for example, said that he did not tell his counsel that Ms. Provost's car stopped on 12th Street or that Defendant Hall walked up to her car as depicted in the animation. Defendant Dixon also admitted that the gunshots portrayed by the word "bang" in the animation did not accurately reflect the number or timing of the gunshots actually fired.

At the conclusion of the hearing, the trial court found the computer generated animation inadmissible stating:

> It's my judgment that the State's motion in limine will be granted. Let me say, I agree with several things [Defendant Dixon's counsel] said. The defendant has a right to explain his story in his own words. And part of my decision has to do with the excellent job Mr. Dixon has done in explaining.
>
> The second thing is, it's not excluded for the inaccuracies alone. I think they could be dealt with on a cross-examination. I'm more concerned that its cumulative, it's not necessary, [and] it does carry substantial impact with the jury.

Relying on *State v. Farner*, 66 S.W.3d 188 (Tenn. 2001), Defendant Dixon argues that the computer animation was consistent with the State's proof and aided the jury in visualizing the sequence of events recounted in Defendant Dixon's testimony, particularly his return to the Kroger parking lot before the first gunshot was fired.

As the supreme court observed in *Farner*, "[c]omputer generated evidence is an increasingly common form of demonstrative evidence." *Id.* at 208 (citations omitted). A computer animation,

-12-

as opposed to a computer simulation, is used to visually "illustrate and explain a witness's testimony." *Id.* Like any other form of evidence in Tennessee, however, the computer animation must be relevant. Tenn. R. Evid. 402. If relevant, the evidence is still subject to exclusion if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. The admission of evidence is largely discretional, and a trial court's ruling as to the admissibility of evidence will not be disturbed on appeal unless there is a clear showing of abuse. *State v. Harris*, 30 S.W.3d 345, 350 (Tenn. Crim. App. 1999).

The *Farner* court stated that the proponent of the evidence must "establish that the computer animation is a fair and accurate depiction of the event it purports to portray." *Id.* at 209 (citations omitted). The Court explained that "[b]ecause the jury may be so persuaded by [the animation's] life-like nature that it becomes unable to visualize an opposing or differing version of the event, the requirement that the animation fairly and accurately portray the event is particularly important when the evidence at issue is a computer animated recreation of an event." *Id.* (citations omitted).

In *Farner*, the defendant was convicted of criminally negligent homicide and other offenses resulting from a drag race in which he and the victim were co-participants. A computer generated animation of the drag race and resulting collision was prepared from the police officer's accident report and photographs of the accident scene and surrounding area. The animation contained fifteen visualizations of the collision, portraying various speeds and vantage points.

The *Farner* court was concerned not with the cumulative effect of the evidence but the balance between the evidence's probative value and any prejudice caused by the inaccuracies embodied within the animation. The events depicted in the animation, for example, were inconsistent with the eye-witness testimony. In addition, although the investigating police officer had not been able to determine the speed at which the two vehicles were traveling immediately prior to the collision, the animation portrayed the cars traveling at 73.88 m.p.h. based on the preparer's personal assumptions derived from the data he was provided. The court concluded "that the trial court abused its discretion in admitting the computer animated visualization in this case because it is not a fair and accurate portrayal of the event depicted, and, as a result, its probative value was substantially outweighed by the danger of unfair prejudice." *Id.* at 209.

The trial court in the case *sub judice* placed less concern on the inaccuracies contained within the computer animation than the cumulative nature of the evidence. Defendant Dixon suggests that the trial court improperly drew a distinction between the use of computer animation to assist an expert's testimony and an animation to illustrate a lay witness's testimony. We do not read the trial court's ruling in this light. The trial court's main concern was the cumulative effect of the evidence. While acknowledging that a computer animation might be a useful tool to assist the jury in understanding the complexities sometimes attached to an expert's testimony, such assistance was not necessary for Defendant's testimony. The main purpose of the animation was to emphasize Defendant Dixon's testimony that he returned to his car prior to the firing of the first gunshot. Defendant Dixon's testimony on this point was corroborated by the State's witness, Ms. Brooks.

In addition, Defendant Dixon used a series of photographs of the Kroger parking lot and surrounding area to demonstrate his movements immediately prior to the shooting to the jury. The decision to admit or limit cumulative evidence rests within the sound discretion of the trial court. *State v. Brown*, 836 S.W.2d 530, 533 (Tenn. 1992).

In this case, it does not appear that the trial court abused its discretion in ruling the computer animation inadmissible. Moreover, it does not appear that the exclusion of the computer animation affected the results of the trial. *See* Tenn. R. Crim. P. 52(a). The jury, by its verdict finding Defendant Dixon guilty of the lesser included offense of facilitation, obviously accredited his and Ms. Brook's testimony that Defendant Dixon had returned to his car before the victim was shot. Defendant Dixon is not entitled to relief on this issue.

## VI. Defendant Dixon's Sentencing Issues

Defendant Dixon argues that his sentence of nine years for his conviction of facilitation of second degree murder was excessive. Defendant Dixon contends that he was a favorable candidate for full probation under Tennessee Code Annotated section 40-35-303. After the parties' briefs were filed, Defendant Dixon informed the court pursuant to Rule 27(d) of the Tennessee Rules of Appellate Procedure that he relied on the United States Supreme Court's decision in *Blakely v. Washington*, ___ U.S. ___, 124 S. Ct. 2531 (2004) in support of his argument that his sentence is excessive.

At the conclusion of the sentencing hearing, the trial court found two applicable enhancement factors. That is, Defendant Dixon has a previous history of criminal convictions in addition to those necessary to establish the appropriate range, and Defendant Dixon, although not the shooter, was aware that a firearm was used in the commission of the offense. *See* Tenn. Code Ann. § 40-35-114(2) and (10). The trial court acknowledged that Defendant Dixon cooperated with the police, but found that any mitigation that might be attributed to this factor was negated by the false statements Defendant Dixon initially made to the investigating officers. Based on the presence of two enhancement factors and no mitigating factors, the trial court sentenced Defendant Dixon to nine years confinement.

When a defendant challenges the length, range, or manner of service of a sentence, this Court conducts a *de novo* review with a presumption that the determinations made by the trial court are correct. *Id.* § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). "If the trial court applies inappropriate factors or otherwise fails to follow the 1989 Sentencing Act, the presumption of correctness falls." *State v. Shelton*, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992). Because we find that the trial court misapplied enhancement factor (10) in determining the length of Defendant Dixon's sentence, our review is *de novo* without a presumption of correctness.

The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments. Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, and -210; *State v. Smith*, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

As a Range I offender convicted of a Class B felony, Defendant Dixon is subject to a sentence of between eight and twelve years. Tenn. Code Ann. § 40-35-112(a)(2). In calculating the sentence for a Class B felony conviction, the presumptive sentence is the minimum in the range if there are no enhancement or mitigating factors. *Id.* § 40-35-210(c). If there are enhancement but no mitigating factors, the trial court may set the sentence above the minimum, but still within the range. *Id.* 40-35-201(d). If both enhancing and mitigating factors are present, the trial court must start at the presumptive minimum, enhance the sentence within the range as appropriate for the enhancing factors, and then reduce the sentence as appropriate for the mitigating factors. Tenn. Code Ann. § 40-35-210(e).

Defendant Dixon did not present any evidence at the sentencing hearing. The presentencing report, however, reflects that Defendant Dixon has two prior convictions for simple possession of drugs, and one conviction for possession of drug paraphernalia. Thus, application of enhancement factor (2), Defendant has a prior history of criminal convictions, is appropriate. *Id.* § 40-35-114(2).

Enhancement factor (10) requires a finding that the defendant possessed or employed a firearm during the commission of the offense. Although it is clear that Defendant Hall employed a firearm during the commission of the offense, there is no evidence in the record to support a finding that Defendant Dixon was armed. We cannot conclude that this enhancement factor can be applied vicariously under the facts presented. While the evidence is sufficient to support Defendant Dixon's conviction of facilitation of second degree murder, it cannot be said that he "possessed or employed a firearm" during the commission of his offense. *See State v. Gomez*, No. M2002-01209-CCA-R3-CD, 2004 WL 305787 (Tenn. Crim. App., Nashville, Feb. 18, 2004), *perm. to appeal granted* (Tenn. Oct. 4, 2004); *State v. Harris*, No. 03C01-9507-CC-00202, 1996 WL 403585 (Tenn. Crim. App., Knoxville, July 19, 1996), *perm. to appeal denied* (Tenn. Dec. 30, 1996).

Based upon our *de novo* review, we conclude that the trial court properly considered factor (2) in determining the length of Defendant Dixon's sentence, but improperly considered factor (10). We next address the impact of the ruling in *Blakely,* if any, on the length of Defendant's sentence. The State argues that Defendant Dixon has waived any sentencing issues that are implicated by *Blakely* under Rules 3(e) and 36(a) of the Tennessee Rules of Appellate Procedure. Because *Blakely*, however, calls into question certain aspects of our current sentencing scheme, we will address Defendant Dixon's challenge to the length of his sentence on the merits.

In *Blakely*, the United States Supreme Court concluded that "'[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'" *Blakely*, 124 S. Ct. at 2536 (*quoting Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 2362-63, 147 L. Ed. 2d 435 (2000)).

Prior to *Blakely*, the *Apprendi* court had observed "that nothing in [the] history [of the common law] suggests that it is impermissible for judges to exercise discretion–taking into consideration various factors relating both to offense and offender–in imposing a judgment *within the range* prescribed by statute." *Apprendi*, 530 U.S. at 481, 120 S. Ct. at 2358 (emphasis in original). Thus, the Supreme Court of Tennessee concluded that under *Apprendi*, a trial court still retained its discretion to consider applicable enhancement and mitigating factors so long as the defendant's sentence is not enhanced beyond the statutory maximum. *Graham v. State*, 90 S.W.3d 687, 692 (Tenn. 2002).

The *Blakely* court, however, clarified that the relevant "statutory maximum" which forms the basis of the *Apprendi* rule "is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings." *Blakely*, 124 S. Ct. at 2537. *Blakely*, however, does not preclude a sentencing court's consideration of the defendant's prior convictions as an enhancement factor in determining the length of the defendant's sentence. *Id.* at 2536. As the *Apprendi* court observed, prior convictions do not relate to the commission of the offense for which the defendant is being sentenced, and presumably the prior convictions "had been entered pursuant to proceedings with substantial safeguards of their own." *Apprendi*, 530 U.S. at 488, 120 S. Ct. at 2361-62. Thus, enhancement of Defendant Dixon's sentence in the case *sub judice* based on his prior convictions is unaffected by *Blakely*.

The trial court sentenced Defendant Dixon to nine years, or one year over the presumptive sentence of eight years for a Range I, standard offender, of a Class B felony. Although we conclude that the trial court misapplied enhancement factor (10), this error does not necessarily lead to a reduction in the length of his sentence. *State v. Winfield*, 23 S.W.3d 279, 284 (Tenn. 2000). The *Blakely* ruling does not preclude the consideration of Defendant's prior criminal convictions in determining the length of his sentence. Based on the presence of one enhancement factor and no mitigating factors, we conclude that a sentence of nine years for Defendant Dixon's conviction of facilitation of second degree murder is appropriate. Because Defendant Dixon's sentence exceeds eight years, we need not address his arguments concerning his eligibility for probation. Tenn. Code Ann. § 40-35-303(a) (Sentence actually imposed must be eight years or less before a defendant is eligible for probation).

## CONCLUSION

After a thorough review of the record we affirm the judgments of the trial court.

THOMAS T. WOODALL, JUDGE